**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **CHARTER SERVICES, INC., and** | ) | |
| **MOBILE FRACTIONAL LEASING, LLC,** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.: 09-00281-KD-N** |
| | ) | |
| **DL AIR, LLC, *et al.*,** | ) | |
| **Defendants.** | ) | |

**ORDER**

This matter is before the Court on the Motion for Summary Judgment filed by

Defendants Central Progressive Bank, Blossman Bancshares, Inc. and Richard Blossman (Docs.

30-32),[1] Plaintiffs' response in opposition (Docs. 34, 35) and Defendants' Reply thereto (Doc.

38).

**I.     Relevant Background**

**A.     Procedural History**

On May 20, 2009, this case was removed to this Court on the basis of federal diversity

subject matter jurisdiction.[2]  (Doc. 1).  On April 30, 2010, based on the plaintiffs' notice of

voluntary dismissal, the following claims were dismissed: Count One (Breach of Contract) of the

Complaint against Defendants Blossman Bancshares, Inc., Central Progressive Bank, Inc. and

---

[1]  Defendant DL Air, LLC did not file a motion for summary judgment.

[2]  The original civil action entitled "*Charter Services, Inc. and Mobile Fractional Leasing, LLC v. D.L. Air, LLC; Central Progressive Bank; and Richard Blossman*" CV-08-901566, was filed in the Circuit Court of Mobile County, Alabama on October 2, 2008, and removed to this Court on November 7, 2008. On March 5, 2009, the undersigned issued an Order remanding the case to state court citing a failure of the removing Defendants to prove there was complete diversity of the parties for purposes of federal jurisdiction as the citizenship of all members of Mobile Fractional Leasing, LLC and DL Air, LLC were not presented to the Court. The case was again removed to this Court on May 20, 2009.

Richard Blossman;[3] and Count Two (Breach of Guarantee) of the Complaint against Defendants D.L. Air, LLC, Blossman Bancshares, Inc., Central Progressive Bank, Inc. and Richard Blossman.

## B. Factual History

This case arises from a contractual agreement relating to the lease of usage of aircraft between Plaintiff Mobile Fractional Leasing, LLC ("MFL")[4] and DL Air, LLC ("DL Air"),[5] and a contractual agreement for management services incident to that lease between Plaintiff Charter Services, Inc. ("Charter")[6] and DL Air. Plaintiffs allege that DL Air failed to make payments under the terms of the renewals of these agreements and that Defendants Central Progressive Bank ("CPB"),[7] Blossman Bancshares ("BB")[8] and/or Richard Blossman ("Blossman")[9] – *none of which*

---

[3] Count One of the Amended Complaint also names Defendant DL Air, however the parties did not move to dismiss Count One as to DL Air and thus it remains pending.

[4] MFL is a Delaware limited liability company formed in 2001 as a fractional leasing business and is wholly owned by sole member George Brown who is a resident of the State of Alabama (Doc. 1 at 3) (leases aircraft and then subleases a fractional interest of the use of that aircraft to others). (Doc. 31-1 at 2-3 (Dep. Brown at 7, 9-10)). See also Doc. 53.

[5] DL Air is a Delaware limited liability company (Doc. 7 at 1) that has been wholly owned by Defendant Richard Blossman since 2002; he is the sole member and is a resident of the State of Louisiana. (Doc. 31-3 at 6-7 (Dep. Blossman at 24, 26)). See also Doc. 50.

[6] Charter, an Alabama corporation (Doc. 1 at 3) wholly owned by Robert "Bobby" Marks (President), is in the business of aircraft charters and providing management services for those who own/lease aircraft. (Doc. 31-2 at 2-3 (Dep. Marks at 7-9)). GulfShares Management is a limited liability company of which Marks was the only member. (Id. at 3 (Dep. Marks at 10-11)). Jerry Lightsey is the director of marketing and sales at Charter. (Id. at 2 (Dep. Marks at 8).

[7] CPB is a Louisiana bank (Blossman is the CEO) which is managed by a management committee (5-6 people who review invoices/approve payment by a majority vote). (Doc. 31-3 at 10 (Dep. Blossman at 37, 39); Doc. 31-4 at 2 (Dep. Faciane at 6, 8); Doc. 1 at 4). Brandon Faciane is the President of CPB. (Doc. 31-4 at 2 (Dep. Faciane at 6)). According to CPB President Faciane, Blossman had no involvement in CPB's management committee's vote regarding aircraft leasing (even though he was a committee member) because he had a conflict as he owned the company that was leasing the planes to CPB. (Id. at 4-6 (Dep. Faciane at 16-17, 23-24)). The committee reviewed and approved the expenditures before the charter, as well as paid the monthly management/leasing fees in addition to invoices for the

*were parties to the Agreements* – are liable for DL Air's failure to pay. Specifically, Plaintiffs argue that CPB, BB and Blossman are liable under theories of piercing the corporate veil/alter ego and promissory fraud.

On May 23, 2002, Blossman purchased 100% of the membership interest in DL Air, which at that time owned an airplane. (Doc. 31-3 at 6-7 (Dep. Blossman at 24, 26); Doc. 31-5). Prior to the agreements with Plaintiffs, DL Air sold the airplane. (Doc. 31-3 at 7 (Dep. Blossman at 27-28)). DL Air does not presently own assets or real property apart from some cash assets in checking accounts at CPB. (Id. at 7-8 (Dep. Blossman at 28-29)).

On September 22, 2006, Plaintiff MFL and DL Air entered into an **Aircraft Lease Agreement** through which MFL subleased a fractional portion of use of an aircraft to DL Air. (Doc. 31-1 at 3 (Dep. Brown at 11-12); Doc. 31-3 at 8 (Dep. Blossman at 29-30); Doc. 31-6 (9/22/06 Aircraft Lease Agreement)). According to Brown, MFL's owner, "[i]t's a direct lease between [MFL] and D.L. Air or [CPB]. I have what's called a head lease with Charter [] and the right to lease the plane by billable hours, and so ... I guess it's a sublease." (Doc. 31-1 at 3 (Dep. Brown at 12)). Blossman signed the Aircraft Lease Agreement on behalf of DL Air and Brown signed on behalf of Plaintiff MFL. (Doc. 31-6 at 11; Doc. 31-1 at 3 (Dep. Brown at 11); Doc. 31-3 at 8 (Dep. Blossman at 29-30)). The Aircraft Lease Agreement was for a term of one (1) year; it expired on September 21, 2007. (Doc. 31-6 at 3; Doc. 31-1 at 4 (Dep. Brown at 15-16)).

plane's actual use. (Id.)

[8] BB is a closely-held Louisiana corporation (Doc. 1 at 4); Blossman owns 12% and controls 46% of the shares and is the CEO and Chairman of the Board. (Doc. 31-3 at 3 (Dep. Blossman at 9-10)). BB wholly owns CPB. (Id.)

[9] Blossman is an individual resident of Louisiana. (Doc. 6 at 2). Blossman is CEO of CPB and runs BB as a holding company that owns 100% of CPB. (Doc. 31-3 at 3 (Dep. Blossman at 9-10)).

Even though the Lease Agreement was between MFL and DL Air, Brown testified that he "never dealt with anybody except [CPB]. . . Every payment I received was from [CPB] . . . and . . . my account. . . . said [CPB], and all the checks continued to come from [CPB] on one of their checks. So it was always [CPB] to me. But this contract says what it says [DL Air]." (Doc. 31-1 at 4 (Dep. Brown at 13)). Brown testified that there was a signed contract between MFL and CPB before the MFL-DL Air agreement and that he was "not entirely certain under which contract we were dealing under." (Id. (Dep. Brown at 14)). Brown testified though, that "every payment" came from CPB and "I don't know what Blossman Bancshares' relationship is to [CPB] . . . I never got a check that said this is coming from Blossman Bancshares." (Id. at 8 (Dep. Brown at 29)).

Also on September 22, 2006, DL Air entered into an **Aircraft Management Agreement** with non-party GulfShares Management, LLC ("GulfShares"), under which GulfShares was to provide flight crews, insurance, maintenance and other services on the aircraft DL Air was subleasing from MFL. GulfShores was the party to the contract but Charter performed all the services under the contract (GulfShares outsourced the performance of its obligations under the contract to Charter). (Doc. 31-2 at 3, 7 (Dep. Marks at 11, 26-27); Doc. 31-3 at 8 (Dep. Blossman at 29-30); Doc. 31-7 (9/22/06 Aircraft Management Agreement)). Marks, owner of Charter and GulfShares, testified that the contract was originally entered into between GulfShares and CPB; CPB later requested the name change to DL Air in the contract. (Doc. 31-2 at 4 (Dep. Marks at 16)). In the contract at issue, however, Blossman signed the Aircraft Management Agreement on behalf of DL Air and Marks signed on behalf of non-party GulfShares. (Doc. 31-7 at 11). The Aircraft Management Agreement was for a term of one (1) year; it expired on September 21, 2007. (Doc. 31-2 at 3 (Dep. Marks at 12-13); Doc. 31-7 at 1-2)). MFL was not a party to the Aircraft

Management Agreement.  (Doc. 31-1 at 5 (Dep. Brown at 17)).  According to Marks, Charter received payments from BB and CPB accounts for services rendered under DL Air's contract. (Doc. 31-2 at 3 (Dep. Marks at 17)).

During the original one (1) year term of both the Lease and Management Agreements, DL Air sublet or chartered its use of the aircraft to CPB and occasionally to BB, and in return, CPB and BB paid for their actual use of the aircraft (CPB paid the standard monthly payments that DL Air owed under the terms of the Lease and Management Agreements).  (Doc. 31-3 at 8 (Dep. Blossman at 31); Doc. 31-4 at 2-4 (Dep. Faciane at 8-10, 13-14, 16)).

Plaintiffs issued the first invoice to DL Air.  (Doc. 31-2 at 5 (Dep. Marks at 19-20)).  On September 27, 2006, however, Blossman requested via BB letterhead that Charter send all invoices to CPB (instead of DL Air).  (Doc. 31-8; Doc. 31-3 at 8-10 (Dep. Blossman at 31-35, 40)).  See also (Doc. 31-2 at 5-6 (Dep. Marks at 19-20, 23)).  CPB President Faciane was not involved in that decision. (Doc. 31-4 at 8-10 (Dep. Faciane at 31-32, 36-37)).  Marks testified that CPB asked to make the payments for DL Air and so they did.  (Id. at 4 (Dep. Marks at 23)).  All invoices were subsequently paid by CPB or BB instead of DL Air.  (Doc. 34 at 2; Doc. 31-1 at 4-6 (Dep. Brown at 16, 19-24)).

Both CPB and BB used the aircraft for business purposes.  (Doc. 31-3 at 11-12 (Dep. Blossman at 43-45); Doc. 31-4 at 5 (Dep. Faciane at 18-19)).  According to CPB President Faciane, CPB paid the aircraft leasing bills for the times the bank used the aircraft, and if BB used the aircraft, CPB would refer those bills to BB for payment.  (Doc. 31-4 at 7 (Dep. Faciane at 27-28)).  Faciane stated that CPB "doesn't have anything to do with [the] leasing agreement[]" but just paid the bills on the bank's use of the airplanes.  (Doc. 31-4 at 4 (Dep. Faciane at 14)).  Faciane

understood from Blossman, who was representing DL Air, that the leased airplanes were "coming from DL Air" (CPB would get a quote and decide what to do and pay the monthly bills as "part of what we had to do if we were going to lease the planes[]"). (Id. (Dep Faciane at 16)). According to Blossman, DL Air would provide the aircraft to CPB and/or BB and they would simply pay the charge, without any profit to DL Air. (Doc. 31-3 at 20 (Dep. Blossman at 77)). Blossman explained that "[i]t was a strategy[]" for "that transaction[]" that DL Air not make a profit. (Id. at 20 (Dep. Blossman at 77-79)). DL Air did not have a written lease agreement and did not address liability in that arrangement. (Id. (Dep. Blossman at 79)).

On June 19, 2007, Lightsey of Charter e-mailed Blossman's secretary Deane O'Brien attaching a renewal agreement to "allow us to move seamlessly into the new contract with no 'downtime[]'" and which would not take effect until the last hour of the original contract was flown; he requested that Blossman sign and return the documents. (Doc. 31-9 at 2-4). Shortly thereafter, Blossman, on behalf of DL Air, and MFL executed the **Renewal Term Agreement** for the Aircraft Management Agreement which provided:

> ....In accordance with the current Aircraft Management Renewal Term Agreement between Mobile Fractional Leasing, LLC and DL Air, LLC, a Delaware corporation ("Operator"), dated September 22, 2006, the parties do hereby agree to enter into a one (1) year "Renewal Term."
>
> The Renewal Term effective date shall be the same day on which Operator flies the last of his total allocated hours (102 hours) through the term of the current agreement. The Renewal Term will expire after (1) year or use of 102 flight hours, whichever occurs first. ...

(Doc. 31-9 at 1 (emphasis omitted)). Blossman (for DL Air) signed the Renewal on June 21, 2007 and Brown (for MFL) signed on June 28, 2007. (Id.; Doc. 31-1 at 7 (Dep. Brown at 26-27)). See also Doc. 31-3 at 11 (Dep. Blossman at 42-43)). Additionally, Blossman, on behalf of DL Air,

executed a Renewal Term Agreement with Plaintiff Charter, which included exact language as *supra*. (Doc. 31-3 at 11 (Dep. Blossman at 42-43)). Under the terms of these agreements once the hours available under the original agreement were exhausted the renewal term would automatically take affect. (Doc. 35-4 at 3 (Dep. Lightsey at 10)). The original agreement terminated and the renewal agreement began in July of 2007. (Id.)

On July 12, 2007, the Federal Deposit Insurance Corporation ("FDIC") issued a Cease and Desist ("C&D") Order to CPB. (Doc. 31-4 at 5 (Dep. Faciane at 20); Doc. 35-5). CPB President Faciane testified that when the order was issued, the bank was no longer able to use the aircraft leasing services. (Doc. 31-4 at 5-6 (Dep. Faciane at 20)). In September 2007, Plaintiffs stopped receiving payments on the leasing and management contracts. (Doc. 35-4 at 4 (Dep. Lightsey at 18)). In November 2007, Blossman told Marks that CPB would be unable to charter planes and make payments such that DL Air would not be able to fulfill its obligations to MFL or Charter under the renewal contracts until such time as CPB could again charter the plane. (Doc. 31-3 at 12, 15-17 (Dep. Blossman at 47-48, 58-59, 61, 66-67)). Nevertheless, Blossman testified that DL Air was obligated to the agreement. (Id. at 13 (Dep. Blossman at 49)). Blossman told Marks and Lightsey to bear with DL Air because of the delay in use of leasing; encouraged them to give him more time for CPB and BB to be in a position to use the service; and "intended to ask for some forbearance and time and hopefully things would work out to everyone's benefit[]" so that DL Air could "honor its commitments." (Doc. 31-3 at 25 (Dep. Blossman at 97-99)).

On January 8, 2008, Lightsey, Charter's Director of Marketing & Sales, sent a letter to Blossman's secretary, O'Brien, at CPB, attaching copies of outstanding invoices [5 management/4 lease] for both Charter and MFL, and stating "[s]ince Bobby's [Marks] conversation with Mr.

Blossman at the end of November, we are waiting until January 15th [2008] for resolution of the outstanding invoices." (Doc. 31-10). Lightsey asked that CPB process them for payment and "let me know the time frame, I came [sic] pass that information to everyone here." (Id.)

At 3:57 p.m. on February 8, 2008, Blossman (c/o his secretary O'Brien) e-mailed[10] Lightsey at Charter, stating as follows:

> I have just reviewed your request. I understand your position but I am hopeful we can come to an agreement. I would like to be able to pick up all renewals and reinstate our agreement. Currently I am involved with the bank examiners for our audit and expenses are being restricted for the next 2 to 3 months. Unfortunately I have to wait until these restrictions are lifted before we can reinstate our agreement.
>
> I would like to come to speak with you and Mr. Marks in person. Once the examiners are finished I will have time to arrange to do so.
>
> I hope we will be able to work together to get this issue resolved and I do appreciate your patience to date. If this is unacceptable to you it will not be necessary to file a lawsuit as I will consent judgment if this is what you wish.

(Doc. 31-10 at 11). According to Blossman, DL Air was unable to lease the aircraft "because we had nobody to lease it to[]" because "the people who were leasing it [CPB] were unable to do so." (Doc. 31-3 at 10 (Dep. Blossman at 38-39)). Blossman states that he sent the e-mail on behalf of DL Air. (Id. at 16 (Dep. Blossman at 61)).

Also on February 8, 2008, at 6:40 p.m., Blossman e-mailed Lightsey stating as follows:

> I have received your default notice. I understand your frustration with the new lease agreement. I did speak to Mr. Marks back in mid November 06, and explained to him that my company has experienced the mortgage melt down and we are trying to survive $100 million of the $500 million dollars I have in Real Estate loans are impaired or defaulted. This represents 20% of the portfolio. I have injected the necessary capital to survive this but I will need to liquidate the loans out when and if possible. These properties are along the gulf coast in Alabama & Florida. I was

---

[10] Blossman testified that his secretary sent the e-mail but it "was probably constructed by me, I'm sure." (Doc. 31-3 at 15 (Dep. Blossman at 57-58)).

placed under what is called a C&D (Cease and Desist) during the same time the renewal/new lease was due. This C&D is public record and you can view it for yourself on the FDIC website. I hope to be out of this soon but it is not my call.

My regulators started a scheduled examination on January 15, 08 and upon their completion. I have never had an examination last this long but I never have had these types of problems to work out. Upon the completion of the exam I planned to discuss this matter with them and my board of directors to see if we can get back on track.

If possible I would like to meet with you and explain further if possible.

I understand if you elect not to meet and if your intention is to file a legal action against my company let me know prior to running up a big legal expense. I will work with you, I do not want to fight with you guys.

(Doc. 31-10 at 12). According to Blossman, in this e-mail, he was describing the problems that the bank would have and the reason that CPB is going to have a problem leasing, which would be problematic for DL Air because without CPB, "D.L. Air could not perform." (Doc. 31-3 at 16-17 (Dep. Blossman at 62-67)). "That's a personal email from myself explaining the difficulties that we were going to have in performing–D.L. Air would have in performing its obligation and the reasons behind it. And there were many and they were massive and I laid it all out." (Id. at 17 (Dep. Blossman at 66)). "That was me, personally [talking]. And I wore a couple of different hats at the time. And I was explaining that the bank was going to have a hard time, which is going to cause D.L. Air a hard time, which in turn is going to go back to our agreement, that we're not going to be able to perform, and this is why." (Id. (Dep. Blossman at 66-67)).

According to Marks at Charter, Blossman "basically didn't pay the bill and said he would, and continued to say he would and continued to not pay the bill." (Doc. 31-2 at 7 (Dep. Marks at 28)). Marks explained in his testimony that "[i]f Mr. Blossman had just said, cancel the agreement, I can't pay – but, quite the contrary. When this first started, he kept stringing us out. He kept saying, hey, we're going to get this done. The contract was never canceled but, rather, the request

9

specifically was to continue to be patient, and in that sense we have to be continued to be prepared to fly." (Id. at 10 (Dep. Marks at 39)). Marks added that "[f]rom our standpoint[]" even when a customer is in default or having difficulty, "he can still cure that contract, pay up, and then he would certainly expect to fly." (Id. (Dep. Marks at 40)). Marks testified that in his conversations with Blossman, he indicated that CPB was under audit and was having some issues and "[e]verything he mentioned related to the bank." (Id. at 11 (Dep. Marks at 43)).

As for alter ego evidence, MFL relies on the following: that the client was CPB on the original contract (even though he acknowledges that DL Air was later substituted for CPB); MFL received checks from CPB; MFL made the file in CPB's name; and "[i]n my [Brown's] mind, it was [CPB]." (Doc. 31-1 at 9 (Dep. Brown at 33)). MFL does not have evidence that DL Air was undercapitalized since inception, DL Air does not observe requisite corporate formalities and/or that DL Air, CPB, BB and Blossman ignored the separateness of each other. (Id. (Dep. Brown at 34)).

According to Charter's Marks, "to me they're all the same[]" because he did not know if Blossman was also BB, CPB and/or DL Air because "[h]e has never identified a separation of one versus the other. And in all communication, correspondence, telephone, it's [CPB]. . . and I have no idea when I talked to Mr. Blossman which Mr. Blossman I'm talking to. I assume and have always assumed it's [CPB], other than when he asked to have the contract signed in the name of D.L.Air. I assumed then he is D.L. Air." (Doc. 31-2 at 6-7 (Dep. Marks at 24-25)). However, Marks subsequently testified – when asked if it was his testimony that Charter believes that BB, CPB and DL Air are all the same – that "[w]e don't think they're the same." (Id. at 8 (Dep. Marks at 31)). Charter has no evidence that DL Air was undercapitalized when formed, that DL Air does not observe the requisite corporate formalities, or any other reason to think that CPB and DL Air are one

and the same entity (apart from billing). (Id. at 8-9 (Dep. Marks at 32-33)).

Charter relies on the fact that everything was "represented for the [CPB] bank. And . . . in my discussions with Mr. Blossman, when they were not able to send the payments, he said the bank is going to get this straightened out, the bank is under an audit, please give us more time. It kept stretching out . . . he asked for two or three more months, the bank will get this resolved, the bank will bring everything up to date. Everything presented to us represented that our customer was the bank." (Id. at 9 (Dep. Marks at 33-34)). Charter "was under the impression the only entity using the aircraft was [CPB]." (Id. at 4 (Dep. Marks at 16)). Marks testified that "anything we ever did was [CPB]. The only time I ever heard of or saw D.L. Air was when they requested to change the name and I signed the agreement. I never heard or saw of D.L. Air ever again. That was the only time." (Id. at 6-7 (Dep. Marks at 24-25)). Marks testified that in all his phone calls with Blossman, to him, "he is [CPB]" and he "never, ever mentioned D.L. Air. I never heard D.L. Air come out of his mouth in all my communications." (Doc. 31-2 at 11 (Dep. Marks at 41)). Marks believed that he was dealing with CPB the entire time because the original contract was signed by CPB; the original checks were from CPB; and the checks and trip requests came from CPB. (Id. (Dep. Marks at 41-42)). Marks added that there were some checks from BB. (Id. (Dep. Marks at 42)).

Blossman testified that he "rolled up" DL Air's tax return into his own personal tax return. (Doc. 31-3 at 13 (Dep. Blossman at 52)). Blossman testified that there was not a plan for DL Air to be profitable even though "we wouldn't pass up a profit[,]" but did not recall any ventures that were actually profitable. (Id. at 14 (Dep. R.Blossman at 53)). DL Air has not made a profit in its history – "[t]hey could and they just haven't." (Id. at 18 (Dep. Blossman at 72)). Blossman testified that DL was capitalized –- had money when it was formed and had cash assets – it "was not without

any money." (Id. at 19, 24 (Dep. Blossman at 73, 75, 93)). DL Air "down-streamed" most of the money from the sale of the airplane to Blossman. (Id. (Dep. Blossman at 75)). Blossman testified that, while not sure, he thinks CPB would pay the aircraft invoices and then get reimbursed by BB, or vice-versa, and that CPB's management committee would have handled payment. (Id. at 22 (Dep. Blossman at 85-88)). Blossman testified that "from his desk," he operated as Blossman for CPB, Blossman for DL Air, and Blossman for BB. (Id. at 14 (Dep. Blossman at 55-56)).

## II.     Summary Judgment Discussion

## A.     Standard of Review

Summary judgment should be granted only if "there is no genuine issue as to any material fact and [ ] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).[11] The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The party seeking summary judgment always bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the nonmoving party fails to make "a sufficient showing on an essential element of her

---

[11]  Rule 56(c) of the Federal Rules of Civil Procedure, provides that summary judgment shall be granted:

> if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).

12

case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. <u>Celotex</u>, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." <u>Tipton v. Bergrohr GMBH-Siegen</u>, 965 F.2d 994, 998-999 (11th Cir. 1992), <u>cert. den.</u>, 507 U.S. 911 (1993) (internal citations and quotations omitted). The mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment. <u>Lofton v. Sec'y of the Dep't of Children & Family Serv.</u>, 358 F.3d 804, 809 (11th Cir. 2004), <u>cert. den.</u>, 534 U.S. 1081 (2005).

**B.** **Application**

**1.** **Count One: Breach of Contract**

Pursuant to the parties' Notice of Voluntary Dismissal (Doc. 36) and this Court's Order on same (Doc. 37), Count One as to Defendants CPB, BBB and Blossman, has been dismissed. Accordingly, it is **ORDERED** that the portion of Defendants' motion relating to Count One *as to these defendants* is **MOOT.** However, Count One as to Defendant DL Air remains pending; it has not been placed at issue on summary judgment.[12]

**2.** **Count Two: Breach of Guarantee**

Pursuant to the parties' Notice of Voluntary Dismissal (Doc. 36) and this Court's Order on same (Doc. 37), Count Two as to all of the defendants has been dismissed. Accordingly, it is

---

[12] Plaintiffs' Amended Complaint alleges that DL Air breached the Agreements causing them "significant damages for which they are liable in an amount not less than $82,665.00, plus prejudgment interest, costs, and attorney's fees as agreed." (Doc. 1-4 at 5).

**ORDERED** that the portion of Defendants' motion relating to Count Two is **MOOT**.

### 3. Plaintiffs' Tort Claims[13]

#### a. Counts Three and Four: Piercing the Corporate Veil/Alter Ego

In Counts Three and Four, Plaintiffs seek to pierce the "corporate veil" of DL Air under an alter ego theory and hold CPB, BB and/or Blossman liable for DL Air's alleged contractual liability to Plaintiffs. Specifically, Plaintiffs assert that CPB, BB and Blossman overextended their corporate privileges and used the corporate form "to defeat justice, perpetrate a fraud and avoid contractual responsibility[;]" DL Air is the alter ego of CPB, BB and Blossman because they "had complete control or domination over DL Air, it's finances, policy and business practices so that at the time of the alleged contracts DL Air had no separate mind, will or existence of its own[;]" and DL Air's control was misused by CPB, BB or Blossman causing Plaintiffs' damage. (Doc. 1-4 at 4, 6-7). Plaintiffs allege that DL Air is a sham created to deceive and defraud; all payments made under DL Air were made by CPB, BB or Blossman; DL Air was undercapitalized; DL does not observe the requisite Delaware corporate formalities; and DL Air, CPB, BB and Blossman ignore the

---

[13] DL Air was incorporated in the State of Delaware. As such, Plaintiffs' alter ego/veil piercing claims against DL Air are governed by Delaware law. Jefferson Pilot Broadcasting Co. v.Hilary & Hogan, Inc., 617 F.2d 133, 135 (5th Cir. 1980) (concluding that "[c]onsistently with the first Restatement, we think that Alabama courts would look to the law of the incorporating state . . . in deciding whether to recognize or disregard a corporate entity. See Restatement of Conflict of Laws s 154, Comment a (1934)[]"). See also Horton Homes, Inc. v. Bandy, 2007 WL 4571251, *2 (M.D. Ala. Dec. 26, 2007) (finding that veil-piercing issues concerning disregard of corporate form are to be determined by reference to the law of the state under which the corporation exists). See Ala. Code § 10-12-46(a) (1975) (providing that "[s]ubject to the Constitution of Alabama, the laws of the state or other jurisdictions under which a foreign limited liability company is organized govern its organization, its internal affairs, and the liability of its members[]"). In contrast, Plaintiffs' promissory fraud claim (Count Five) is governed by Alabama law because the injury occurred to Plaintiffs in Alabama. Alabama choice of law rules apply the doctrine of *lex loci delicti* to tort claims, which means that the law of the state in which the injury occurred governs the substantive rights of the injured party. Colonial Life & Accident Ins. Co. v. Hartford Fire Ins. Co., 358 F.3d 1306, 1308 (11th Cir. 2004). Additionally, the parties do not dispute that Alabama law governs the promissory fraud claim.

separateness of one another by "regularly answering" one another's financial obligations. (Id. at 6).

In Delaware, courts disregard the corporate form only in the "exceptional case." See, e.g., Case Financial, Inc. v. Alden, 2009 WL 2581873, *4 (Del. Ch. Aug. 21, 2009) (citing Sprint Nextel Corp. v. iPCS, Inc., 2008 WL 2737409, * 11 (Del. Ch. Jul. 14, 2008)) (unpublished). "Corporate form will be disregarded and individuals will be held personally liable 'in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable consideration among members of the corporation require it, are involved.'" Pauley Petroleum Inc. v. Continental Oil Co., 239 A.2d 629, 633 (Del. 1968). This analysis is labeled the "alter ego"[14] analysis because the court "is examining whether there are legally distinct entities." Mason v. Network of Wilmington, Inc., 2005 WL 1653954, *2 (Del. Ch. Jul. 1, 2005) (unpublished) (citing United States v. Golden Acres, Inc., 702 F. Supp. 1097, 1104 (D. Del. 1988)).

In making this determination, courts look to how the corporation operates and the particular party's relationship to that operation. Harper v. Delaware Valley Broadcasters, Inc., 743 F. Supp. 1076, 1085 (D. Del. 1990). This determination entails a fact intensive inquiry in which courts may consider the following factors "none of which are dominant: (1) whether the company . . . was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the controlling shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a facade for the controlling shareholder." Case Financial, 2009 WL 2581873, *4. See also Golden Acres, 702 F. Supp at 1104.

Significantly, however, there _must_ _also_ be an element of fraud to justify piercing the

---

[14] "The terms 'alter ego theory' and 'piercing the corporate veil' are used interchangeably in Delaware law." Winner Acceptance Corp. v. Return on Capital Corp., 2008 WL 5352063, *5 n.32 (Del. Ch. 2008) (unpublished).

corporate veil.  <u>Mason</u>, 2005 WL 1653954, *3.  ***"[T]he alter ego theory requires that the corporate structure cause fraud or similar injustice . . . The 'injustice' must be more than the breach of contract alleged in the complaint*** . . . ."  <u>Outokumpu Engineering Enter., Inc. v. Kvaerner Enviropower, Inc.</u>, 685 A.2d 724, 729 (Del. 1996) (emphasis added).  <u>See also</u> <u>Mobil Oil Corp v. Linear Films, Inc.</u>, 718 F. Supp. 260, 268 (D. Del. 1989) (concluding that "[a]ny breach of contract and any tort . . . is, in some sense, an injustice.  Obviously this type of 'injustice' is not what is contemplated by the common law rule that piercing the corporate veil is appropriate only upon a showing of fraud or something like fraud . . . To hold otherwise would render the fraud or injustice element meaningless, and would sanction bootstrapping[]").  Moreover, "[s]ince it is the exceptional instance where a court will disregard the corporate form, the party who wishes the court to disregard that form 'bears the burden of proving that there are substantial reasons for doing so.'"  <u>Mobil</u>, 718 F. Supp. at 270-271 (citing <u>Laborers' Pension Fund v. Litgen Concrete Cutting & Coring Co.</u>, 709 F. Supp. 140, 143 (N.D. Ill. 1989) (quoting <u>Contractors, Laborers, Teamsters and Eng'rs. Health and Welfare Plan v. Hroch</u>, 757 F.2d 184, 190 (8th Cir. 1985))).

Concerning undercapitalization and insolvency,[15] the evidence reveals that DL Air had one main asset (an airplane) apart from some "limited amount of cash" and "some money" when

---

[15]  As noted in <u>Mason</u> 2005 WL 1653954, *3:

....mere insolvency is not enough to allow piercing of the corporate veil. If creditors could enter judgments against shareholders every time that a corporation becomes unable to pay its debts as they become due, the limited liability characteristic of the corporate form would be meaningless. Thus, the insolvency inquiry must have a different purpose. Instead, insolvency is one factor to be considered in assessing whether the corporation engaged in conduct that unjustly shields its assets from its creditors. If so, and especially if particular shareholders benefitted from and controlled that conduct, then justice would require the piercing of the corporate veil in order to hold the benefitting shareholders responsible. This concept may also be applicable as the inability to pay creditors becomes imminent and the corporation enters the "zone of insolvency.....

Blossman purchased the company in 2002. (Doc. 31-3 at 7, 19, 24 (Dep. Blossman at 26-29, 73-75, 93)). Blossman also put cash into DL Air and when payments were overdue under the Agreements, DL Air had "a couple of thousand dollars." (Id. at 19, 24 (Dep. Blossman at 75, 94-95)). However, about a year after Blossman's purchase [approximately 2003], DL Air sold its main asset (the airplane) and the proceeds from the sale went to DL Air's sole member and owner, Blossman. (Id. at 19 (Dep. Blossman at 75)). However, there is no evidence that the sale of the primary asset was for the purpose of avoiding current or future obligations. This is especially true in light of the fact that the asset was sold approximately three (3) years before DL Air incurred the obligations at issue.

Regarding the transaction with plaintiffs, Blossman testified that DL Air was "not set up to be profitable" in "these transactions" with plaintiffs, rather DL Air's "strategy" for meeting its obligations to plaintiffs was to allow CPB to use plaintiffs' services and for CPB to pay for them directly. While the plan went awry when CPB experienced economic problems, the evidence alone is insufficient to equate the actions of DL Air with fraud or to otherwise provide a substantial basis for disregarding the corporate form.

As for corporate formalities, the invoices for use of the aircraft under the Charter-DL Air and MFL-DL Air Agreements were paid by CPB or Blossman – not DL Air. Blossman specifically instructed Plaintiffs that all invoices be sent to CPB for payment. DL Air never made any payments to Plaintiffs under the Agreements. Moreover, plaintiffs considered CPB their client, not DL Air, because they had little or no dealings with DL Air (apart from DL Air being the party named in the contracts). Nevertheless, the observance of some corporate formalities is shown in the record through the fact that CPB's management committee regularly met and reviewed and approved payment of the bills for CPB and/or Blossman's usage of aircraft, and in so doing, excluded

Blossman from those approvals "due to his conflict" in owning DL Air. Additionally, Blossman testified that DL Air's franchise taxes (for at least 2007) were paid for by him. (Doc. 31-3 at 20 (Dep. Blossman at 80)). Moreover, both Marks (as Charter's corporate representative) and Brown (as MFL's corporate representative) testified that they had no evidence (or did not know of any evidence) to show that DL Air did not observe the requisite corporate formalities. (Doc. 31-2 at 8-9 (Dep. Marks at 32-33); Doc. 31-1 at 9 (Dep. Brown at 34)). As previously stated, the burden is on the Plaintiffs to show a lack of observance of corporate formalities significant enough to disregard the corporate form.

Concerning whether DL Air was created and functioned as a "facade" for Blossman, CPB and/or BB, it is true that the evidence reveals a web of business arrangements with one common thread - Blossman. Blossman owned 100% of DL Air yet required CPB to pay DL Air's contractual bills for DL Air's Agreements with Plaintiffs. BB – of which Blossman owned 12% and controlled 46% -- owned 100% of CPB. Blossman was also CEO of CPB. Nevertheless, even with this common thread, Plaintiffs have failed to demonstrate how Blossman's ownership resulted in DL Air being "a facade" or a sham entity. Particularly so, in light of the fact that DL Air was created by someone other than Blossman many years before the Agreements existed, and moreover, was purchased by Blossman four (4) years prior to those Agreements.

Furthermore, in considering the totality of circumstances and the foregoing, it is significant that under Delaware law the ultimate question is whether plaintiffs presented substantial evidence of the existence of fraud or inequity *in the use of the corporate form* (i.e., whether the corporate structure itself was used to effect fraud or injustice). Plaintiffs allege that Blossman, CPB and/or BB used DL Air "to defeat justice, perpetrate a fraud and avoid contractual responsibility[]" for "DL

Air's obligations to plaintiffs under the aircraft lease and aircraft management agreements." (Doc. 1-4 at 6-8). As noted *supra*, in Delaware, the fraud or injustice "must be more than the breach of contract." Plaintiffs, however, have limited themselves to precisely that. Namely, Plaintiffs' alter ego/veil piercing allegations are clearly based upon breach of contract allegations -- that Blossman, CPB and/or BB used DL Air to avoid payment (i.e., to breach the two aircraft agreements and avoid contractual responsibilities arising from same). Plaintiffs have not submitted evidence of any other fraud or injustice as contemplated under Delaware law apart from asserting in sweeping fashion that "[t]here are ample genuine issues of material fact supporting the abuse of the corporate form, and fraud, by the Defendants. While Plaintiffs were clearly damaged by the breaching of their agreements, this is far from the only inequity or fraudulent conduct perpetrated by the Defendants in this case." (Doc. 34 at 10). In sum, the fact that Plaintiffs were not paid under the Agreements is not, under Delaware law, a basis upon which to pierce DL Air's corporate veil. While DL Air's alleged breach of contract may be wrongful, "the requisite element of fraud under the alter ego theory must come from an inequitable use of the corporate form itself as a sham, and not from the underlying claim." EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V., 2008 WL 4057745, *12 (Del. Ch. Sept. 2, 2008) (unpublished) (citing Wallace ex rel. Cencom Cable Income Partners II, Inc. v. Wood, 752 A.2d 1175, 1184 (Del. Ch. 1999)). Plaintiffs have not cited sufficient evidence to create a triable issue of whether DL Air existed "for no other purpose than as a vehicle of fraud." Wallace, 752 A.2d. at 1184.

Accordingly, Defendants' summary judgment motion as to Counts Three and Four for piercing the corporate veil and alter ego is **GRANTED.**

### b.      **Count Five: Promissory Fraud**

In the Amended Complaint, Plaintiffs assert a count for promissory fraud against <u>all</u> of the defendants alleging that:

> .... when **Blossman misrepresented to the plaintiffs that they needed more time to bring the account current because of an audit** he made this representation on behalf of himself, DL Air, Blossman Bancshares and/or Central Progressive[]" and that "[a]t the time of Blossman's misrepresentations, he, Blossman Bancshares, Central Progressive, and DL Air had no intention of performing under the contract, and he made those misrepresentation with the intent to deceive the plaintiffs ...

(Doc. 1-4 at 8-9 (emphasis added)).  Plaintiffs add that they reasonably relied upon that misrepresentation, believing it to be true, and were damaged by the misrepresentation.  Plaintiffs allege further that Blossman is liable in his individual capacity for the damages caused by the defendants in reliance upon his misrepresentation, and that BB, CPB or DL Air are also liable for the damages caused by them in reliance upon Blossman's misrepresentation as their agent.  Plaintiffs assert that Blossman informed them that CPB was being audited and that when the audit was completed "all missed payments would be brought current[]" and "represented that if the plaintiffs would hold off on legal action, their relationship could continue as was the case prior to the audit." (Doc. 1-4 at 4 at ¶11).  Plaintiffs allege that based on Blossman's statement and request for time "to bring the account current, plaintiffs agreed to forbear from enforcing their contractual rights." (<u>Id</u>. at ¶16).  In support, on summary judgment, Plaintiffs specifically root their promissory fraud claim in two (2) February 8, 2008 e-mails from Blossman to Charter.

In Alabama, "a claim of promissory fraud is one based upon a promise to act or not to act in the future." <u>Ex parte Michelin North America, Inc</u>., 795 So.2d 674, 678-679 (Ala. 2001).  <u>Black's Law Dictionary</u> defines a promise as "[t]he manifestation of an intention to act or refrain from acting in a specified manner, conveyed in such a way that another is justified in understanding that a

commitment has been made; a person's assurance that the person will or will not do something[.]" Black's Law Dictionary (8th ed. 2004). To prove a claim for promissory fraud the plaintiff must show: 1) a false representation; 2) of a material existing fact; 3) reasonably relied upon by the plaintiff; 4) who suffered damage as a proximate consequence of the misrepresentation; 5) proof that at the time of the misrepresentation, the defendant had the intention not to perform the act promised; and 6) proof that the defendant had an intent to deceive. Southland Bank v. A&A Drywall Supply Co., Inc., 21 So.3d 1196, 1210 (Ala. 2008); Hunt Petroleum Corp. v. State, 901 So.2d 1, 4 (Ala. 2004). See also e.g., G.F. Kelly Trucking, Inc. v. U.S. Xpress Enter., Inc, 281 Fed. Appx. 855, 861 (11th Cir. 2008).

At the outset, Blossman did not make any promises to MFL and Plaintiffs do not allege such. Brown of MFL testified that he did not know of evidence showing promissory fraud in the execution or performance of its contracts. (Doc. 31-1 at 9 (Dep. Brown at 34-35)). Brown also testified that Blossman never made any representations to him about making payments under the contract because he "[n]ever spoke to me." (Id.) Accordingly, to the extent that Plaintiff MFL alleges a promissory fraud claim against Defendants and the Defendants' motion seeks summary judgment on that claim, the Defendants' motion is **GRANTED.**

As for Charter, there is one crucial question. Where is the promise? Charter has not identified any specific promise made by Blossman in the February 8th e-mails upon which it relies – i.e., that he promised to act or not to act in the future. In the Amended Complaint, Plaintiffs base their claim entirely on the assertion that "Blossman misrepresented to the plaintiffs that they needed more time to bring the account current because of an audit[.]" Charter's argument in response to the summary judgment motion reiterates this assertion insofar as Charter notes that Blossman's e-

mails "detail[] the problems facing Central Progressive Bank and why it cannot pay Plaintiffs." (Doc. 34 at 10). The parties do not dispute the fact that CPB was under a C&D Order and its financial capabilities were severely restricted due to the related audit and examination and that this situation impacted DL Air (because CPB was DL Air's primary client). Blossman's e-mails in this regard were not "misrepresentations" because the communications that CPB was in the midst of financial difficulties appear to be accepted as true by the parties.

Additionally, in the e-mails that Blossman sent to Charter, he did not specifically promise anything. Blossman states that he is "*hopeful* we can come to an agreement[;]" that he "*would like* to be able to pick up all renewals and reinstate our agreement[;]" but because of the C&D and audit, "expenses are being restricted for the next two to three months[]" so "[u]nfortunately I *have to wait* until these restrictions are lifted before we can reinstate our agreement." Blossman "*hoped*" they would be able to "work together to get this issue resolved" and noted that if that was "unacceptable" he would "consent [to entry of a] judgment" against him." Blossman added that once the C&D audit and examination conclude, he "plan[s] to discuss this matter with them and my Board of Directors *to see if we can get back on track*." In short, Blossman did not "promise" to do anything or to refrain from doing anything. Blossman simply informed Charter that he was trying to get things worked out but that he would have to wait until the examinations were complete and then take the agreements back to CPB's Board of Directors "*to see if we can get back on track*." Implicit in such communication, is that things may *not* work out and may not be able to "get back on track." In other words, "no promises." Thus, to the extent that Plaintiffs relied upon Blossman's e-mails as some sort of definitive promise, that reliance would not be reasonable under the circumstances.

Moreover, Plaintiffs have not presented any evidence to support their claim that Blossman

made any promises knowing they were untrue when he made them. Plaintiffs simply speculate as to Blossman's intent at the time of the February 8th e-mails, an intent which is belied by the substance of the e-mails. "The burden is on the plaintiff to prove that when the promise was made the defendant intended to deceive . . . [t]he plaintiff cannot meet his burden merely by showing that the alleged promise ultimately was not kept; otherwise, any breach of contract would constitute a fraud . . .[i]t is well settled that 'a jury does not have untrammeled discretion to speculate upon the existence of [the requisite] intent [for promissory fraud].' There must be substantial evidence of a fraudulent intent that existed when the promise was made." Southland, 21 So.3d at 1212.

Further, Plaintiffs assert in the Amended Complaint that Blossman informed them that CPB was being audited and "represented that if the plaintiffs would hold off on legal action, their relationship could continue as was the case prior to the audit." (Doc. 1-4 at 4 at ¶11). This allegation is unsupported by the February 8, 2008 e-mails, and no further evidence has been presented to support the allegation.[16] Rather, the evidence reveals that Blossman specifically said he did not know what would happen and agreed to having a consent judgment entered *against him* – not that he requested that Plaintiffs "hold off on legal action."

Accordingly, Defendants' motion for summary judgment as to Plaintiffs' promissory fraud

---

[16] The only other "promissory fraud" evidence upon which Plaintiffs rely (apart from the two February 8, 2008 e-mails) is the testimony of Marks (Charter) regarding a conversation that he had with Blossman, presumably in November 2007 since there is no evidence of any other conversations. Plaintiffs assert that in that conversation, Blossman told Marks that once the audit and examination of CPB was complete "the bank will bring everything up to date[]"). (Doc. 34 at 3, 10-11 (citing Doc. 35-1 at 5 (Dep. Marks at 33)). Even assuming that this could be construed to be a promise, Plaintiffs have failed to present any evidence that when Blossman made the statements that he had the intent to deceive, i.e., that Blossman knew the bank's obligations would not be brought up to date.

claim (Count Five) is **GRANTED.**[17]

### III.    Conclusion

Based upon the foregoing and as detailed *supra*, the Court finds and it is hereby **ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED in part** and **MOOT in part,** as follows:

1)    Defendants' motion for summary judgment as to **Count One (Breach of Contract)** is **MOOT** <u>only</u> as to Defendants Central Progressive Bank, Blossman Bancshares and Blossman;

2)    Defendants' motion for summary judgment as to **Count Two (Breach of Guarantee)** as to <u>all</u> of the Defendants is **MOOT**;

3)    Defendants' motion for summary judgment as to **Counts Three and Four (Piercing the Corporate Veil/Alter Ego)** is **GRANTED**; and

4)    Defendants' motion for summary judgment as to **Count Five (Promissory Fraud)** is **GRANTED.**

**DONE** and **ORDERED** this the **7th** day of **May 2010.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**

---

[17] Due to the finding that there was no promise or misrepresentation, the Court need not address the "promissory fraud via agency" allegation in Plaintiffs' Amended Complaint.